FILED

FEBRUARY 28, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DISTRICT

| | | |
|---|---|---|
| SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 1 | ) ) ) | |
| Plaintiff | ) ) | Case No. |
| v. | ) ) | Judge |
| THE WACKENHUT CORPORATION | ) ) | |
| Defendant | ) ) ) | |

**08 C 1205**

**JUDGE MORAN**
**MAGISTRATE JUDGE COX**

### COMPLAINT

Plaintiff, Service Employees International Union, Local 1 ("Local 1"), brings this action to enforce a final and binding arbitration decision against Defendant The Wackenhut Corporation ("Wackenhut"). In support, Local 1 states as follows:

1.    This matter arises under the laws of the United States and this Court has jurisdiction over this matter pursuant to Section 301 of the Labor Management Relations Act (LMRA) of 1947, 29 U.S.C. § 185.

2.    Local 1 is a labor organization representing employees in an industry affecting commerce within the meaning of Section 2(5), (6) and (7) of the National Labor Relations Act (NLRA), 29 U.S.C. §§152(5), (6) and (7), and Section 301 of the LMRA, 29 U.S.C. § 185. Its principal offices are located at 111 E Wacker Drive, Chicago, Illinois, within the geographic jurisdiction of this Court.

3.    Defendant Wackenhut is a corporation and an employer in an industry affecting commerce within the meaning of Section 2(2), (6) and (7) of the NLRA, 29 U.S.C. §§ 152(2), (6) and (7) and Section 301 of the LMRA, 29 U.S.C. § 185.

Wackenhut has offices throughout the United States, including 40 N. Wells, Ste. 400 Chicago, IL 60606 and 4300 Winfield Rd. Warrenville, IL 60555.

4.    At all relevant times, Defendant Wackenhut has engaged in business in Cook, Grundy and DuPage Counties, Illinois, within the jurisdiction of this court.

5.    The events at issue in the arbitration between Local 1 and Defendant Wackenhut all occurred at the Dresden Nuclear Power Station located near Morris, Illinois in Grundy County, Illinois, within the jurisdiction of this court.

6.    At all times relevant to this action, Local 1 and Defendant Wackenhut were parties to a collective bargaining agreement (a true and correct copy is attached hereto as Exhibit A), in effect from January 28, 2006 through January 27, 2009.

7.    Article 6, Section 2 of the 2006-2009 collective bargaining agreement provides for a multi-step grievance procedure culminating in final and binding arbitration to resolve any difference or dispute which may arise under the Agreement.

8.    On January 24, 2007, Local 1 filed a grievance against Wackenhut under the parties' collective bargaining agreement pursuant to Article 6, Section 2 of the collective bargaining agreement (attached hereto as Exhibit B), protesting the suspension of Local 1 member Mike Shultz.

9.    On February 16, 2007, Local 1 amended its original grievance against Wackenhut pursuant to Article 6, Section 2 of the collective bargaining agreement (attached hereto as Exhibit C), protesting the subsequent termination of Mr. Shultz.

10.    The grievance was processed through the contractual grievance procedure and advanced to arbitration.

11.    An arbitration hearing was held in Chicago, Illinois before Arbitrator Ann Kenis ("Arbitrator") on September 10, 2007.

12.    On November 8, 2007, the Arbitrator issued an opinion and award (attached hereto as Exhibit D) sustaining the grievance in its entirety and awarding Mr. Shultz reinstatement with back pay from the date of his discharge. (Exhibit D, p. 17-18).

13.    The Arbitrator's award and opinion draws its essence from the collective bargaining agreement

14.    Since November 8, 2007, Wackenhut has failed to comply with the Arbitrator's award and opinion by refusing to reinstate or pay back wages owed to Mr. Shultz. Wackenhut's refusal to abide by the Arbitrator's award violates § 301 of the Labor Management Relations Act, 29 U.S.C. § 185.


WHEREFORE, Local 1 requests that the Court enter an order enforcing the arbitration award, order Defendant Wackenhut to comply with and abide by the Arbitrator's award by reinstating and paying all monies owed to Mike Shultz and award such other relief as the Court deems just and proper.


Respectfully submitted,                          Dated:  February 28, 2008



Steven M. Stewart
Associate Counsel
SEIU Local 1
111 E. Wacker Drive, 25th Floor
Chicago, IL 60601

312.233.8748


3

**312.233.8848 (Fax)**

L:\Litigation\Wackenhut\Complaint.enforce arb. award.Shultz.doc

# EXHIBIT

# A

# DRESDEN

# COLLECTIVE BARGAINING

# AGREEMENT

## Between

## The Wackenhut Corporation

## And

## Service Employees International Union

## Local 1

## Duration:

## January 28, 2006 – January 27, 2009

# TABLE OF CONTENTS
## DRESDEN COLLECTIVE BARGAINING AGREEMENT

PREAMBLE............................................................... 1

**ARTICLE 1**
RECOGNITION........................................................ 1-2

**ARTICLE 2**
MANAGEMENT RIGHTS........................................ 2

**ARTICLE 3**
UNION MEMBERSHIP............................................ 2-4

**ARTICLE 4**
CHECK-OFF............................................................. 4-5

**ARTICLE 5**
NO DISCRIMINATION............................................ 5

**ARTICLE 6**
GRIEVANCE AND ARBITRATION PROCEDURE............. 5-9

**ARTICLE 7**
NO STRIKES – NO LOCKOUTS................................ 9-10

**ARTICLE 8**
DEFINITIONS....................................................... 10-12

**ARTICLE 9**
SENIORITY.......................................................... 12-15

**ARTICLE 10**
UNION REPRESENTATION.................................... 16-18

**ARTICLE 11**
HOURS OF WORK................................................ 18-19

**ARTICLE 12**
DISTRIBUTION OF OVERTIME.............................. 19

**ARTICLE 13**
CALL-IN PAY....................................................... 19-20

**ARTICLE 14**
WAGES AND CLASSIFICATIONS........................... 20

-i-

## TABLE OF CONTENTS

**DRESDEN COLLECTIVE BARGAINING AGREEMENT**

**ARTICLE 15**
    **HOLIDAYS**.................................................................... **20-21**

**ARTICLE 16**
    **VACATIONS**.................................................................. **21-23**

**ARTICLE 17**
    **INSURANCE BENEFITS**............................................... **24-26**

**ARTICLE 18**
    **SICK LEAVE**................................................................ **26-28**

**ARTICLE 19**
    **LEAVES OF ABSENCE**................................................. **28-29**

**ARTICLE 20**
    **UNIFORMS**.................................................................. **29-30**

**ARTICLE 21**
    **FUNERAL PAY**............................................................. **30**

**ARTICLE 22**
    **GENERAL**.................................................................... **31-35**

**ARTICLE 23**
    **JURY DUTY**................................................................. **35-36**

**ARTICLE 24**
    **401(K) RETIREMENT PLAN**......................................... **36**

**ARTICLE 25**
    **WAIVER**...................................................................... **37**

**ARTICLE 26**
    **SEPARABILITY**........................................................... **37-38**

**ARTICLE 27**
    **DURATION**.................................................................. **39**

**SCHEDULE A**
    **WAGES** ...................................................................... **40**

**APPENDIX A**
    **SHARED RESOURCE AGREEMENT**............................... **41**

1

# AGREEMENT

## PREAMBLE

This Agreement made and entered into as of the 28th day of January, 2006, by and between THE WACKENHUT CORPORATION, hereinafter referred to as the Employer and SERVICE EMPLOYEES INTERNATIONAL UNION, Local #1, hereinafter referred to as the Union.

This Agreement evidences the desire of the parties to promote and maintain harmonious relations between the Employer, its Security Officers, and the Union as their exclusive bargaining representative.

It is the intent and purpose of the Agreement to assure sound and mutually beneficial industrial and economic relationships between the parties, to provide an orderly and peaceful means of resolving grievances, and to set forth the basic agreement between the parties covering rates of pay, wages, hours of work, and other conditions of employment.

The Union, the Employer, and all Security Officers are bound by and hereby pledge their cooperation in observing all provisions of this Agreement.

## ARTICLE 1

## RECOGNITION

The Employer hereby recognizes the Union as the exclusive bargaining representative with respect to rate of pay, hours of work, and other conditions of employment for all regular full-time and part-time Security Officers employed by the Employer at its Client, Dresden Nuclear Generating Station in Morris, Illinois, but

excluding all office clerical employees, professional employees, sergeants, lieutenants, and supervisors as defined in the Act and all other employees.

## ARTICLE 2

## MANAGEMENT RIGHTS

This Agreement shall not be construed to infringe or impair any of the normal management rights of the Employer, which are not inconsistent with the provisions of this Agreement. Included among management rights is the right to hire new employees and direct the working forces; the right to discipline, suspend, or discharge employees for just cause; the right to assign shifts; the right to require employees to observe Employer policies, rules and regulations not inconsistent with this Agreement; the right to plan, direct, control, continue, or discontinue operations; the right to establish and change work schedules and assignments; the right to select and determine the number and type of employees required; the right to determine the method and manner of operations; the right to establish the standards of work performance for employees; the right to introduce new or improved methods; and the right to change existing business practices. This statement of management rights which remains unimpaired by this Agreement is not intended to exclude others, which are not mentioned herein.

## ARTICLE 3

## UNION MEMBERSHIP

**Section 1**    It is mutually agreed that, as a condition of employment, all security officers covered by this Agreement shall become members of the Union on the

2

31st day following the actual beginning of such employment or the effective date of this Agreement, whichever is the later; and that thereafter, as a requisite of continued employment, such security officers including those presently members of the Union shall remain members in good standing in the Union, provided, however, that the termination of Union membership of any security officer for reasons other than the failure of the security officer to pay the periodic dues and initiation fees uniformly required as a condition of retaining membership shall not effect the employment status of such security officer.

Section 2    The Union agrees to accept as a member, upon the application and without discrimination, any new security officer who may be hired by the Employer for employment within the bargaining unit.

Section 3    The Union agrees to maintain the Union dues and initiation fees at reasonable rates for the duration of this Agreement and also any presently existing arrangements for installment payments of initiation fees and to accept as a member any security officer who pursuant to the Agreement applies for membership without any charge other than initiation fees uniformly required as a condition of acquiring or retaining membership.

Section 4    Security officers losing membership in the Union due to failure to pay the periodic Union dues or uniform initiation fees shall not be retained in the employ of the Employer. The names of security officers who have thus lost their standing in the Union for the above reasons and whom the Union specifies to be discharged for that reason, are to be submitted to the Employer in written notice from the Union and signed by the Union Representative.

**Section 5**    Nothing contained in this Article or in this Agreement shall be construed so as to require the Employer to violate any applicable law, state, or federal, including, but not by way of limitation, the Labor Management Relations Act of 1947 as amended.

## ARTICLE 4

### CHECK-OFF

**Section 1**    Subject to the limitations of any state or federal law, the Employer agrees that for the period of this Agreement upon presentation of a written, personally signed authorization from any security officer subject to this Agreement, a copy of which form is annexed to this Agreement and made a part thereof, the Employer will deduct from such security officers pay the Union initiation in two (2) equal monthly installments and monthly dues.   The Employer agrees to transmit such sums collected by the Employer to the Union no later than thirty (30) days after the month in which sums are collected.   When the security officer's earnings are insufficient to cover the authorized deductions, the said Union fee and/or dues shall be deducted in the next payroll period in which sufficient security officer's earnings are available.

**Section 2**    All sums collected in accordance with such signed authorization card shall be remitted by the Employer to Local #1.

**Section 3**    The Union agrees to indemnify the Employer and hold it harmless against any and all suits, claims, demands, and liabilities for damages, back pay, or penalties that shall arise out of or by reason of any actions that shall be taken by the

4

Employer for the purpose of complying with the foregoing provision of this Article, Check-off and Article 3, Union Membership.

## ARTICLE 5

## NO DISCRIMINATION

The Employer and Union agree that neither the Employer nor the Union shall discriminate in respect to employment as prohibited by State and/or Federal Law. The use of gender in this Agreement shall include the other gender.

## ARTICLE 6

## GRIEVANCE AND ARBITRATION PROCEDURE

**Section 1**     For the purpose of this Agreement, a grievance is defined as a difference of opinion, controversy, or dispute between the Employer and a Security Officer regarding violations of this Agreement. Such grievances must be presented to the Employer in writing within seven (7) days after it occurred, stating in addition to the security officer's version of the facts, the specific article and section of the Agreement allegedly violated, the date the alleged violation occurred, and signed by the Security Officer.

**Section 2**     A Security Officer may consult directly with his/her shift supervisor on a matter which does not necessarily constitute a grievance. In any case where a Security Officer is not satisfied with respect to the disposition of a matter regarding the meaning or application of any provisions of this Agreement on which he/she has informally consulted with his/her shift supervisor, the Union may submit the

5

complaint as a grievance. A grievance as defined above shall be handled in the following manner:

## Step 1

The grievance shall first be submitted by the Union to the Employer's Site Supervisor or his/her designated representative in writing and signed by the Security Officer within seven (7) days from the date of the occurrence of the incident or when the Security Officer or the Union became aware of it or should have become aware of it, and if more than said seven (7) days elapse, the Security Officer and the Union shall be barred thereafter from processing the complaint as a grievance. Such Site Supervisor shall within seven (7) days after receiving the grievance render his/her decision in writing.

## Step 2

If the above steps have been exercised and resolution has not been achieved between the Union and the Employer, the Steward, or Union representative will notify the Employer, in writing, of their intent to proceed within five (5) days. Upon receipt of a Step 2 Grievance Notification, the Employer will either issue a response within fifteen (15) working days or schedule a meeting with the Union to discuss the issues of the case within thirty (30) working days.

## Step 3

If the grievance has not been settled satisfactorily under the above procedure, the Union may submit the grievance for arbitration. The Union will do so by sending written notice by certified mail to the Employer's District Manager or the District Manager's appointed representative as cited in Step 2. The Union will then have ten (10) days after

6

the Employer has received the above-referenced notice to request the Federal Mediation and Conciliation Service to nominate seven (7) persons who are qualified and willing to act as arbitrators in the grievance.  At the conclusion of this ten (10) day period, if the Union has not applied to FMCS for a panel of arbitrators, it is understood that the grievance will be non-arbitrable and the Union will, therefore, be prohibited from processing the grievance any further in the arbitration process.

**Step 4**

The Union and the Employer each shall, within thirty (30) days, eliminate three (3) of the persons so nominated by each eliminating one (1) at a time. The remaining nominee shall be considered to have been selected by the agreement of the parties and shall then become the sole arbitrator.  The Employer and the Union shall alternate striking the first arbitrator.

**Section 3**      The award of such arbitrator shall be in writing and shall be final and binding upon the Employer, the Union, and the Security Officer involved.  The arbitrator may consider and decide only the particular grievance presented in the written stipulation of the Employer and the Union, and the arbitrator's decision shall be based solely upon an interpretation of the provisions of this Agreement. The arbitrator shall not have the right to amend, take away, modify, add to, change, or disregard any of the provisions of this Agreement.   In the event that an arbitrator shall determine that a Security Officer has violated an Employer rule, regulation, or policy for which said Security Officer was charged, the arbitrator shall not have the right to reduce, modify, or in any way alter the penalty assessed by the Employer. The parties to the case shall share equally the expense of the arbitrator, including the hearing room incurred with the

arbitration. Any postponement shall be paid for by the requesting party. The Employer and the Union are responsible for the wages and expenses of its own witnesses and representatives.

**Section 4**     In calculating time for the purpose of this Article, Saturdays, Sundays, and Holidays shall not be counted. Time limits hereinabove mentioned may be modified, if desired, only in writing by mutual agreement between the Employer and the Union. If the Employer does not comply with the aforementioned time limits, the grievance will automatically be awarded to the grievant with the exception of any grievance involving termination. If the Union does not comply with the aforementioned time limits, the grievance will be null and void.

**Section 5**     No more than one (1) grievance can be submitted to any one (1) arbitrator, at any one (1) time in any one (1) case except by mutual, written agreement of the parties.

**Section 6**     Notwithstanding the foregoing provisions listed and described under the Arbitration Procedure, at any time during the process leading to arbitration, the Employer and the Union can by written mutual agreement settle the grievance without further action being necessary.

**Section 7**     Grievances involving discharges and/or disciplinary suspension for an indefinite period will be initiated at the 2nd Step of the Grievance Procedure. Grievances involving discharge and/or disciplinary suspension shall be filed within ten (10) days of discharge or suspension. A 2nd Step meeting shall be held within twenty (20) days following receipt of the grievance. The meeting shall consist of the Employer's

8

representatives, a Union Representative, and/or the Steward involved, and the grievant. This 2nd Step may be waived by mutual consent of the parties.

**Section 8**    Any grievance shall be considered null and void if not filed and processed by the Union or the security officer represented by the Union, in strict accordance with the time limitations set forth above.  There shall be no recognition of a continuing grievance so as to frustrate the intent of strict adherence to these time limitations.

## ARTICLE 7

## NO STRIKES/NO LOCK OUTS

**Section 1**    During the term of this Agreement or any renewal or extension thereof, neither the Union, its officers, officials, representatives, agents, members, or any Security Officer will authorize, instigate, aid, condone, promote, participate in, or engage in any strike, work stoppage, slowdown, boycott, picket line, unfair listing, sit-down, sit-in, refusal to cross any picket line, or other interruption, refusal, cessation, limitation, or interference with the Employer's work or the business of the Employer or any impeding of business of the Employer regardless of whether there is a claim by the Union of breach of this Agreement or of federal, state, or local law by the Employer.  Any Security Officer or Security Officers who violate the provisions of this Article will be subject to disciplinary action up to and including dismissal.

**Section 2**    During the term of this Agreement, the Employer will not lockout Security Officers.  The term "lock-out" as used herein does not include the failure to return to work of Security Officers or the discharge, suspension, termination, shutdown,

9

10

layoff, or failure to recall by the Employer or the exercise of any of the management rights normally possessed by the Employer.

## ARTICLE 8
## DEFINITIONS

**Section 1**    A regular "full-time" security officer under this Agreement is one who is assigned a minimum of forty (40) hours per week or who has worked at least 1800 hours during the preceding calendar year. For purposes of this section, 1800 hours includes all earned benefit and training time. All other security officers under this Agreement shall be classified as regular "part-time" security officers.

**Section 2**    Security Officers who do not meet the definition of a regular "full-time" security officer under this Agreement are regular "part-time" security officers.

**Section 3**    The term "Armed Security Officer" shall mean a security officer who has successfully completed:

a.    the physical and mental examinations and reexaminations as required by the United States Government and/or the State Government, and/or the client; and

b.    passes all the necessary firearms training requirements and meets all necessary firearms qualifications and requalifications as required by the United States Government, and/or the State Government, and/or the site security plan and/or site training and qualification plan and carries a firearm as part of his/her job requirements; and

    c.       all required training programs in the Security Plan, Nuclear Security Regulations, Radiation Control, and other training programs and/or security requirements as required by the United States Government and/or the State Government and/or the client at present or in the future; and

    d.       all physical agility tests.

    **Section 4**       The term "Unarmed Security Officer" shall mean a security officer who has successfully completed:

    a.       the physical and mental examinations and reexaminations as required of an unarmed guard by the United States Government and/or the State Government, and/or the client; and

    b.       all required training programs in the Security Plan, Nuclear Security Regulations, Radiation Control, and other training programs as required by the United States Government and/or State Government and/or the client.

    **Section 5**       The Employer will provide the Union with as much advanced notice as reasonably possible of any change to any job requirements.

## MEMO OF UNDERSTANDING

## PART-TIME PROGRAM

A part-time officer is considered an employee (armed or unarmed) that is not regularly scheduled to work a minimum of 1800 hours during the course of their anniversary year.

Part-time officers shall be scheduled by shift supervision for the purpose of reducing the amount of overtime worked by regular full-time employees. Part-time officers will be required to maintain their training qualifications, and will normally be scheduled to work at least once in a (30) day period.

Part-time officers are responsible for notifying shift supervision of changes in their availability, and may be removed from the part-time employee roster for poor attendance. For the purpose of this article, poor attendance shall be considered not reporting for a scheduled work assignment (3) or more times in a (12) month period.

Part-time employees assigned to work a holiday shall be paid in accordance with Article 15 "Holidays" of this agreement.

A part-time officer that accepts a full-time position will accumulate seniority in accordance with Article 9 of this agreement as of the date of their full-time assignment. Full-time officers that accept part-time positions shall retain but not accumulate full-time seniority as of the date of their part-time assignment.

Unscheduled overtime assignments that come up during the course of a shift, will be offered to regular full-time officers on-shift prior to offering it to part-time officers.

Part-time officers will be entitled to the following vacation days conditioned on completing at least (340) actual hours of scheduled work during each anniversary year:

After (1) Year = 1,   After (3) Years = 2,   After (8) Years = 3

## ARTICLE 9

### SENIORITY

**Section 1**      Seniority shall be defined as the total length of a Security Officer's continuous service with the Employer in the bargaining unit covered by this Agreement. Such seniority shall be computed from the first day worked of the Security Officer's most current employment in said bargaining unit.

**Section 2**    A security officer shall be on probation for the first one hundred twenty (120) calendar days of actual service with the Employer. The security officer shall be regarded as on probation and he/she may be terminated at the sole discretion of the Employer without any recourse by said probationary security officer to the Grievance Procedure set forth in this Agreement. Upon shift assignment, the probationary security officer may be represented by the Union; however, the Union may not represent probationary security officers in any matter relative or pertaining to their termination. Upon completion of the probationary period, the security officer shall acquire seniority standing from the first day worked.

**Section 3**    Seniority and qualifications within an Employee's current job classification will govern layoffs and recall. After a layoff, Unarmed Security Officers who fail to qualify for an opening in the armed classification are not precluded from applying for an unarmed position during the period mentioned in Section 4(e).

**Section 4**    A security officer shall lose all seniority rights and his employment will be terminated if he:

a.    Quits or retires.

b.    is discharged for just cause.

c.    is absent from work for two (2) consecutive days without notifying the Employer or fails to return from an approved leave of absence on the scheduled date of return, except where such security officer shows reasonable cause for failure to give such notice or failure to return to work, which reason is acceptable to the Employer.

13

14

d.  fails to return to work following recall after a layoff within five (5) days after being notified by telegram or registered mail, use of which means shall be considered to be notification, sent to his/her last known address, except where such security officer (within fifteen (15) calendar days but not thereafter) shows reasonable cause for failure to report, which reason is acceptable to the Employer.

e.  is laid off or off sick or off injured, including workers' compensation, for a continuous period exceeding the lesser of twelve (12) months or the length of his/her employment. Notwithstanding the foregoing, the continuous period referenced in the preceding sentence shall be twelve (12) months for employees hired prior to ratification of this Agreement.

f.  fails to meet a requalification requirement in accordance with the Site Security Plan and training and qualification plan or government agency. "Personnel in the armed security officer classification who fail to meet the requirements of their classification as set forth in this Agreement, but meet the requirements set forth in the unarmed security officer classification, may bump the least senior employee in that classification providing they are more senior to that person. An employee may exercise the provisions of this Section no more than one (1) time [three (3) attempts within thirty (30) days ] in any twelve (12) month period."

g.  fails to meet any of the requirements necessary to be a nuclear Security Officer. If the failure to meet the requirements originates from a medical disorder which is correctable within the framework of Paragraph 4(e)

herein and the security officer submits evidentiary notification by the physician or medical staff utilized by the Employer that the medical disorder has been corrected, seniority will be retained.

h.      is permanently denied unescorted site access or who has been determined by the licensee to be unsuitable for security work.

**Section 5**      The Employer agrees to furnish the local union with an up-to-date seniority list in June and December of each year of the contract.

**Section 6**      Where two (2) security officers have the same first day worked for the Employer, the security officer whose last name is alphabetically first will be regarded as the senior security officer of record for the seniority provisions of this Agreement.  In instances wherein a security officer changes his/her name, the seniority placement shall remain unchanged.

**Section 7**      Bargaining unit security officers will not be promoted out of the bargaining unit without their consent.

**Section 8**      Site Seniority will govern day-off preference and shift preference within each of the two (2) classifications; Armed Security Officer and Unarmed Security Officer.

**Section 9**      A Security Officer who transfers out of the bargaining unit to a supervisory position will continue to retain but not accumulate seniority for up to four (4) months.  If the Security Officer returns to the bargaining unit within this four (4) month period, he/she will not lose his/her seniority rights in the bargaining unit and will resume accumulation of seniority.  If the Security Officer remains outside the bargaining unit over four (4) months, his/her seniority will be terminated in the bargaining unit.

15

# ARTICLE 10

## UNION REPRESENTATION

**Section 1**     It is stipulated and agreed that only the below designated officers of the Union, either individually or collectively, are the authorized officers and agents of the Union and shall be the only ones to be recognized by the Employer as being authorized to act for or on behalf of the Union in any manner whatsoever under the terms of this Agreement.

The authorized officers are:

> President

> Business Manager

> Union Representatives

By letter, the Union shall notify the Employer immediately of the names of the incumbents in each of the foregoing offices and thereafter shall promptly advise, by certified letter, of any change thereof.

**Section 2**     It is stipulated and agreed that the foregoing are the sole and exclusive agents for the Union, and they shall exercise only the authority prescribed and defined herein.  Any other authorization heretofore given to them by custom, action, or otherwise for any other purpose is hereby withdrawn and declared null and void.  Any other authority of the agents, except as provided for herein, shall be certified to the Employer in writing, signed by the proper officer of the Union, and under the seal of the Union.

**Section 3**     The Union Stewards have authority only to investigate and process grievances arising under the terms of this Agreement in accordance with the procedure

set forth in the Agreement. Security Officers will not be denied the right to have a Union representative present if available during disciplinary investigations or disciplinary procedures if the Security Officer requests such representation. In each case involving a disciplinary investigation or procedure with a Security Officer, the Employer will inform the Security Officer of his/her right to have a Union representative present at the meeting.

If the Union representative is not on site and the security officer requests representation, management will select a Security Officer to act as a non-participatory witness from a designated list of mutually agreed upon bargaining Union member. The Union will, by certified letter, notify the Employer of the Union Stewards so authorized to represent the Union. The Union shall be represented by one (1) Chief Steward. On each shift/team there will be one (1) Steward and one (1) alternate Steward. The alternate will function only in instances wherein the Steward is absent.

**Section 4**    Stewards shall not be laid off during their term of office except for just cause so long as there is work available which they are competent to perform. This provision shall not apply to alternate Stewards. The Union will furnish the Employer with a list of Security Officers so affected.

**Section 5**    The Employer will endeavor to keep the local Union and the Union Stewards advised of its management and supervisory personnel who will function under the grievance procedure.

**Section 6**    Union Stewards who attend Union meetings, labor management meetings, or other Union related functions will be granted time off without pay and without attendance point deductions for those meetings.

**Section 7**    In the event that a bargaining unit member invokes their Weingarten rights and no steward is on site at that time, then the member shall be allowed to pick another member to be the witness.

## ARTICLE 11

## HOURS OF WORK

**Section 1**  The workweek shall commence consistent with the work schedule in place and end one hundred sixty eight (168) hours later.  The Shift Schedules are as follows:

AM Shift: The workweek will commence at 12:00 P.M. Saturdays to 11:59 A.M. the following Saturday for the dayshift, with the understanding that the work hours are 6:00 A.M. to 6:00 P.M.

PM Shift:  The workweek will commence at 12:00 A.M. Sunday to 11:59 P.M. the following Saturday for the nightshift, with the understanding that the work hours are 6:00 P.M. to 6:00 A.M.

Unarmed Security Officers workweek will commence Monday at 12:00 A.M. and run for 168 hours thereafter.

The foregoing is descriptive only; nothing herein shall be construed as guaranteeing any specified number of hours of work or pay per week.

Power Shift:  The normal Power Shift work hours are 6:00 A.M. to 2:00 P.M. or 7:00 A.M. to 3:00 P.M.

Nothing contained herein is a guarantee of starting or ending times which are subject to change, as necessary, to meet Client needs.

18

**Section 2**  Overtime at the rate of one and one half (1-1/2) times an employee's regular base, straight-time wage rate will be paid to the employee for all hours actually worked in excess of forty (40) hours within the work week.   There shall be no compounding, duplication or pyramiding of payments for the same hours worked under any circumstances of any description.

# ARTICLE 12

## DISTRIBUTION OF OVERTIME

**Section 1**    Due to the operational needs of the Employer, a written overtime procedure will be developed and mutually agreed to and may be amended upon agreement of both parties.

**Section 2**    The Employer agrees to correct an overtime error at the Security Officer's appropriate, applicable rate providing they are valid errors the Employer admits to.

# ARTICLE 13

## CALL-IN PAY

Security Officers who are called to the station for investigations and employment status or who are called to work and/or permitted to come to work without having been notified that there will be no work shall receive a minimum of four (4) hours work or pay at their hourly rate of pay.  Additionally, for annual physicals, training, meetings, and other non-shift coverage and related matters, employees called in on their regularly scheduled day off will receive a minimum of two (2) hours at their appropriate rate of

pay. Non-worked time shall not be counted towards calculating overtime. The Employer shall have the right to require the Security Officer to work for this payment. This Article shall not apply to Security Officers either called in prior to their shift or required to work past their assigned shift. This paragraph shall not apply where work is not available because of acts of God, catastrophe, or other conditions beyond the control of the Employer.

## ARTICLE 14

## WAGES AND CLASSIFICATIONS

The wage rates for classifications covered by this Agreement are set forth in Schedule A attached hereto and made a part of this Agreement. The attached wage schedule shall be effective January 28, 2006. Increases and decreases in the wages set forth in the attached Schedule A shall not be made effective during such time as a Security Officer is absent due to sickness, accident or on an authorized leave of absence.

## ARTICLE 15

## HOLIDAYS

Section 1      Regular "full-time" Security Officers shall receive eight (8) hours pay at his/her regular base, straight time wage rate for each holiday not worked. Hours paid under this paragraph will not be considered as hours worked for the purpose of computing overtime. Each Security Officer must work a minimum of eight (8) hours or twelve (12) hours depending on their regularly scheduled shift, on his/her regularly work day immediately before and immediately after aforesaid holidays and the day of such

20

holiday, if scheduled, in order to receive holiday pay except in cases due to verifiable emergency weather and/or related road conditions.

**Section 2**    Holidays recognized will be as follows:

New Year's Day (January 1)
Memorial Day
Independence Day (July 4)
Labor Day
Veteran's Day (November 11)
Thanksgiving Day
Day after Thanksgiving Day
Day before Christmas (December 24)
Christmas Day (December 25)

**Section 3**    Employees who work on a designated holiday will receive double time pay for all actual hours worked.  If a Security Officer works their day off on a holiday and the hours worked are less than eight (8) hours, the Security Officer will receive eight (8) hours of holiday pay, plus the appropriate rate of pay for actual hours worked.


# ARTICLE 16

## VACATIONS

**Section 1**    Regular "full-time" Security Officers who have successfully completed one (1) year of service will be entitled to forty-eight (48) hours paid vacation at their base, straight time wage rate. Earned vacation shall be paid on the Security Officer's anniversary date or when the vacation is taken, providing at least two (2) weeks notice has been given in writing to the Employer.  The vacation may be taken during the twelve (12) month period following completion of each year of service.  Vacations will be selected by seniority in the first quarter of the year.  After the first quarter, Security

21

22

Officers must apply for their forty-eight (48) hour vacation at least three (3) weeks in advance of their intended vacation. All vacations will be granted to the first Security Officer applying for the period regardless of seniority. There will be no joining or butting of vacation over two (2) twelve (12) month periods.

**Section 2**  Vacations may be taken in eight (8) or twelve (12) hour increments depending on the employee's regular scheduled workday. When a Security Officer is taking a one (1) day vacation, said Security Officer must apply for his/her vacation day one (1) week in advance of his/her intended vacation day. Such one (1) day vacation shall be granted at the Employer's discretion.

**Section 3**  After two (2) years of service, regular "full-time" Armed Security Officers will become eligible on their second anniversary date for ninety-six (96) hours paid vacation at the base, straight time wage rate under the same conditions spelled out above for a forty eight (48) hour vacation. After five (5) years of service, regular "full-time" Armed Security Officers will become eligible on their fifth (5th) anniversary date for one hundred thirty-two (132) hours paid vacation at the base, straight time wage rate under the same conditions spelled out above for a forty eight (48) hour vacation. After fifteen (15) years of service, regular "full-time" Armed Security Officers will become eligible on their fifteenth (15th) anniversary date for one hundred forty-four (144) hours paid vacation at the base, straight time wage rate under the same conditions spelled out above for a forty-eight (48) hour vacation.

**Section 4**  After two (2) years of service, regular "full-time" Unarmed Security Officers will become eligible on their second anniversary date for eighty (80) hours paid vacation at the base, straight time wage rate under the same conditions spelled

out above for a forty eight (48) hour vacation. After five (5) years of service, regular, full time Unarmed Security Officers will become eligible on their fifth year anniversary date for one hundred twenty (120) hours paid vacation at their base, straight time wage rate under the same conditions spelled out above for a forty eight (48) hour vacation. After fifteen (15) years of service, regular, full time Unarmed Security Officers will become eligible on their fifteenth year anniversary date for one hundred thirty-two (132) hours paid vacation at their base, straight time wage rate under the same conditions spelled out above for a forty-eight (48) hour vacation.

**Section 5**    Security officers changing shifts after selecting a vacation, must select a new vacation period from the weeks still available.

    a.    If a security officer is laid off, his/her earned vacation time and pay will be prorated. He/she will receive the prorated vacation pay on his/her last paycheck.

    b.    Pro-rated vacation benefits shall be paid to full-time security officers who have worked one or more years of service, and who voluntarily resign. In order to receive pro-rated pay, the security officer must give the employer a minimum of ten (10) working days notice prior to the effective date of termination.

**Section 6**    Earned but unused vacation benefits shall be paid to the Officer upon the conclusion of the anniversary year.

## ARTICLE 17

## INSURANCE BENEFITS

**Section 1** The Employer agrees to pay eighty percent (80%) of the cost of group health insurance for a regular full-time employee with three (3) months actual service with the Employer. See your booklets for further details and the rules governing the plans.

**Section 2** The Employer agrees to pay the entire cost of Life Insurance as follows:

Group Term Life – Twenty Five Thousand ($25,000.00)

Accidental Death and Dismemberment Insurance – Twenty Five Thousand ($25,000.00).

Employees may purchase additional life insurance through payroll deduction.

**Section 3** Regular full-time employees have the option of providing medical insurance coverage for their eligible dependents. The Employer agrees to pay eighty percent (80%) of the total premium costs for the following: (a) Employee + child(ren); (b) Employee + spouse; and (c) Employee + family. The employee's contribution is subject to change during the life of this Agreement.

**Section 4** The Employer reserves the right to provide the same coverage with another carrier and to use managed care techniques in regard to medical care.

**Section 5** The Employer will offer regular full-time employees the opportunity to enroll in an alternative insurance plan offered through the Union in lieu of the Comprehensive Medical coverage referenced in the above sections of this Article. The

24

Employer will pay a contribution equal to this cost for coverage described in Sections 1 and 3 above. Any additional cost will be paid by the employee.

**Section 6**    A stand-alone dental and vision plan is available to all eligible employees, per the Plan. Employees may also enroll in optional packages of benefit which may include: dental, optical, sickness and accident and life insurance programs offered through the Union with the total cost of said packages being the sole responsibility of the employee.

**Section 7**    The Employer and the Union have the right to offer multiple insurance plans.

**Section 8**    When a Security Officer is off sick or injured, the Employer will continue to pay the insurance premium for the Security Officer through the end of the month in which he/she last worked. While off due to sickness or injury, the Security Officer may continue the insurance by paying the full cost of the Employer's offered plan premium to the Employer on or before the 15th of the month.

**Section 9**    Security Officers may at their option choose to decline all insurance benefits, including life insurance. Such option shall be granted to Security Officers once per year at the same time insurance options are selected for the following year.

**Section 10**    The Union will provide the Employer, in writing, thirty (30) days before implementation, detailed information regarding changes in coverage, benefits, premium rates, and open enrollment periods for the managed care plan. Included in this information shall be the insurance carrier's description of benefits and premium rate

information.   The Employer shall not be obligated to make any payments for any managed care plan offered through the Union.

**Section 11**    The Employer will provide the Union in writing thirty (30) days before implementation detailed information regarding changes in coverage, benefits, premium rates, and open enrollment periods for the Employer's sponsored insurance plan.  Included in this information shall be the insurance carrier's description of benefits and premium rate information.

## ARTICLE 18

### SICK LEAVE

**Section 1**    After completing one full year of continuous employment and each anniversary year thereafter, all regular full-time employees will be eligible for forty-eight (48) hours of sick leave per year.  Any unused sick leave will be paid to the employee at his straight time base rate of pay on the employee's yearly anniversary date.   Upon completion of their probationary period, new hire personnel with less than one year service will be provided with one (1) unpaid sick day without providing documentation of the illness.

**Section 2**    It is understood that the following conditions apply to sick leave:

A.    There will be no duplication of Worker's Compensation and sick leave payments for the same day.

B.    Employees will be paid sick leave based on their base, straight time wage rate.

C.     There shall be no pro-ration of sick leave pay for terminated employees. Employees who terminate their employment or are terminated by the Company prior to their anniversary date shall not be eligible for sick leave pay under the provisions of this Article.

D.     An individual who has been absent three (3) consecutive workdays or more due to injury or illness must supply a doctor's certificate on the day he returns to work.

E.     If an employee has unused sick time it may be used towards his/her illness without falling under the attendance policy. If an employee does not have any available sick time and produces a doctor's statement, he/she will not fall under the attendance policy. This is limited, however, to two (2) occurrences per anniversary year. The Company reserves the right to investigate an employee's illness or call off and impose discipline where appropriate.

**Section 3**     Sick Leave shall be taken in increments of time corresponding to the daily work schedule (8 or 12 hours) to which that employee is assigned at the time the sick leave is to be taken.

**Section 4**     Earned sick days may be requested in advance for reasons other than employee illness. Employees who exercise this provision must request time off no less than seven (7) days in advance. Payment will be based upon an employees regularly scheduled shift (8 hours or12 hours).

It is understood that the granting of time off under this provision is not automatic, but based upon the needs of the business and consistent with the provisions of Article 16.

27

An employee who requests time off under this provision and whose request is not granted, but who still calls off or is absent, shall provide a doctor's verification of illness/injury upon his/her return to work.

## ARTICLE 19

### LEAVES OF ABSENCE

**Section 1**    Leaves of absence for good and sufficient reason subject to Employer manpower requirements may be granted a regular full time employee at the sole discretion of the Employer. It is understood that any compensable time (i.e., vacation, sick leave) applicable to the leave will first be allocated to such leave, and when compensable time is exhausted, the remaining portion of the leave will be unpaid. The said employee seeking such leave of absence without pay shall put it in writing, citing the reason for such request and the calendar period. If such leave of absence without pay is granted, a written notice of approval will be given the employee. Seniority shall accumulate during such leave of absence. It is understood that an employee on such leave of absence without pay will not accept other employment and such employee's return to work will be subject to his seniority standing in the unit. Failure to report to work as scheduled following an unpaid leave of absence will operate as a voluntary termination.

**Section 2**    Family Medical Leave Act in accordance with the law.

**Section 3**    A Security Officer who is off sick or injured for five (5) consecutive regularly scheduled work days shall be granted a leave of absence up to the limits specified in Section 1 above, during the period of his/her illness or injury without

loss of seniority, provided the Security Officer notifies the Employer that he/she is sick or injured not less than two (2) hours prior to reporting time of his/her next scheduled shift, unless impossible or unreasonable to do so. The Employer may require satisfactory evidence of such Security Officer's sickness or injury. At any time upon request of the Employer, the Security Officer must submit to an examination by a physician of the Employer's choice.

**Section 4**      Military leave as provided by law.

**Section 5**      Women who adopt a child, males who are married to women who bear or adopt a child, and single males who adopt a child shall be allowed to take five (5) unpaid days leave.

**Section 6**      In the event a Security Officer exhausts all of the compensable time in the use of Leave of Absence, Family Medical Leave Absence or any absence related thereto, the Company agrees that it will endeavor to allow employees time off. It is expressly agreed and understood that such granting of time off will be in strict accordance and subject to the requisite needs of the Dresden Nuclear Facility.

## ARTICLE 20

## UNIFORMS

The Employer will continue to furnish each Security Officer with the standard uniform issue. Replacement uniforms required due to loss or neglect will be chargeable to the Security Officer. On termination of employment, Security Officers must either turn in their uniforms or pay for same. Full-time employees shall receive an annual boot

allowance of one hundred fifteen ($115.00) dollars on his/her anniversary date. Part-time employees that have worked a minimum of 900 hours during their previous anniversary year shall receive an annual boot allowance of sixty-five ($65.00) dollars.

## ARTICLE 21

## FUNERAL PAY

**Section 1**     A regular "full-time" Security Officer who has completed his/her probationary period will be granted three (3) days off with pay to attend the funeral of or make funeral arrangements for a member of his/her immediate family. Immediate family is defined as spouse, children, mother, father, brother, sister, grandparents, mother-in-law, and father-in-law. Two days off with pay shall be granted for son-in-law and daughter-in-law.

**Section 2**     A day's pay is eight (8) or twelve (12) times a Security Officer's base, straight-time wage rate depending on the Employee's regular scheduled work hours. Funeral pay is not to be construed as time worked or paid for the purpose of computing hours worked to compute overtime pay.

**Section 3**     The Employer reserves the right to require proof of attendance at the funeral

31

## ARTICLE 22

## GENERAL

**Section 1.**    Security Officers are required to have an operational and functional telephone in their place of residence, and they are required to provide site management with their current address and telephone number.

**Section 2.**    The Employer will pay the initial cost of Security Officer's licenses, except drivers licenses, or permits required in the performance of a Security Officer's assigned duties as required by city ordinance or state statute, if any is now required or would be required in the future, and the cost of renewals. However, should a Security Officer lose or cause to be lost his/her license or permit, any cost incurred for replacement of said license or permit shall be paid solely by said Security Officer.

**Section 3.**    A bulletin board will be provided by the Employer, which may be used by the Union for posting notices which are approved by the President of the Local Union or Chief Steward and restricted to:

    a.    Notices of Union recreational/social affairs;

    b.    Notices of Union elections and nomination sheets for Local and Unit Officer elections;

    c.    Notices of Union appointments and results of Union elections; and

    d.    Notices of Union meetings.

The Local Union President or Chief Steward will provide the above-listed material to the Site Manager and if such material meets the above standards, it will be posted forthwith. There will be no other posting of any kind of literature upon Client property other than as herein provided.

**Section 4**    The Union recognizes that it is the responsibility of all Security Officers to familiarize themselves with the job duties and rules and regulations established by the Employer and the Client and to perform the job duties as required and to obey the Employer and Client rules and regulations and to faithfully report all violations thereof. The Union agrees that Security Officers shall discharge all duties as assigned to them impartially and without regard to any union or non-union affiliation of any personnel at or assigned to the Dresden site, and that failure to do so constitutes sufficient cause for discipline, up to and including termination.

**Section 5**    The Employer recognizes the need to provide hygiene relief for Security Officers. The Union recognizes the need for Security Officers to limit their requests for such relief and further recognizes the requirement that Security Officers must be relieved before leaving their posts. It is understood that a supervisor may be called upon to relieve a Security Officer.

**Section 6**    Upon written request, the Employer will provide the Union copies of the Employer's rules and regulations at least **seven (7)** days prior to implementation, if practical. The Union shall be required to maintain control of all such documents. The Union also recognizes that the Employer cannot give copies of post orders, site security, plant proprietary information or other client classified documents. The Union also recognizes that it has the same access to public Nuclear Regulatory Commission documents as the Employer.

**Section 7**    The Union understands and agrees that the Employer is a service organization contracted for by the client to fill their security needs and that inherent in such service, the satisfaction and desires of the client shall not be impaired or infringed.

**Section 8**    The Union reserves the right to question the reasonableness of the Employer's rules and regulations.

**Section 9**    It is the intention of the Employer that non-bargaining unit Security Officers will not normally perform work usually assigned to bargaining unit Security Officers, except in instances of training, unforeseen or unusual occurrences and emergencies.

**Section 10**    Union members shall be permitted to wear a Union button, provided said button does not exceed one (1) inch in diameter.

**Section 11**    If the Employer must change a Security Officer's scheduled days off or shift, the Employer will provide said Security Officer with as much notice as possible. The Employer will also attempt to schedule the Security Officer's off days or leave days consecutively.

**Section 12**    Labor/Management meetings will be held as needed but not less than quarterly to discuss working conditions, job assignments, and issues of mutual concern, to include improved work performance. Meetings may be waived by mutual agreement of both parties. Bargaining unit participants may attend at their discretion but will be limited to no more than five (5) persons. Employer's participants will also be limited to five (5) persons. Participation will be on a voluntary basis, except that the on-duty Union Stewards will not have his/her pay deducted as a result of the meetings.

**Section 13**    The Security Officers will have an option to enroll in a direct deposit plan.

**Section 14**    In cases where the Employer believes that a Security Officer's job performance is unsatisfactory, the Employer shall notify the Security Officer of such

unsatisfactory performance, and a signed and dated copy of the reprimand may be inserted into the Security Officer's file, within seven (7) days (excluding suspension pending actions). A copy of the reprimand shall be given the Security Officer and a copy shall be made available to the Union upon request. In cases where absences, tardies, or lates are assessed on the evaluation, the reasons for those assessments will be recorded on the evaluation form. Use of a Security Officer's contractual sick days shall not be part of any evaluation.

In the event that any security officer has received any type of discipline that they feel is unjust, that officer can appeal this discipline to the Project Manager for review. The Project Manager then has seven (7) days to respond back to the Security Officer with a final decision.

**Section 15**    Security Officers will be afforded the voluntary opportunity for firearms practice at regular intervals at least on a quarterly basis. The Employer agrees to provide weapons, ammunition, and range supervision.

**Section 16**    Scheduled lunch breaks will not normally be interrupted for purpose of watching training films or completing read and signs, except in case of emergency or unusual operational requirements. Under these conditions, breaks will be rescheduled if possible.

**Section 17**    If a Security Officer fails his/her annual firearms requalification on the second attempt, the Employer will, within seven (7) days and utilizing a different instructor at the Security Officer's option, grant a third attempt at requalification. If the Security Officer fails his/her third attempt, the Employer will consider granting a fourth attempt, providing this fourth attempt is in compliance with the Client's Security

Training Program. Factors to be considered will include the Security Officer's practice sessions during the preceding year, progression of scores during the requalification attempts, factors presented by the Security Officer, and any other factors deemed pertinent by the Employer.

**Section 18**    A minimum of a fifteen (15) minute break shall be granted a Security Officer who is working four (4) or eight (8) hours of overtime before or after their regularly scheduled shift.

**Section 19**    In the event the Client in its capacity as the licensee determines that a Security Officer is not suitable to work in a security capacity, the Union recognizes the Client's right to make such a determination. The Employer agrees to take the requisite action(s) to attempt to locate alternative related employment for the affected Security Officer.

**Section 20**    In the event that it becomes necessary to create a new classification or to reclassify Security Officers, the Company agrees to meet and negotiate with the Union regarding benefits.

**Section 21**    Regardless of Daylight Savings Time, Security Officers shall be paid for actual hours worked.

## ARTICLE 23

### JURY DUTY

A regular "full-time" Security Officer will be granted a leave of absence to perform Jury Duty. Such Security Officer will be paid the difference, if any, between

his/her Jury Duty pay and his/her regular straight time hourly rate for a maximum of ten (10) days.  Reimbursement shall be payable only if:

1.  The Employer receives prior notification.

2.  Security Officer provides evidence to the Employer that the Jury Duty was performed on the day or days for which reimbursement is claimed.  Time thus paid is not to be construed as time worked for the purpose of computing overtime pay.

## ARTICLE 24

### 401(K) RETIREMENT PLAN

**Section 1**      The Employer will provide a 401(k) Plan for eligible employees. The Employer shall deposit the appropriate annual match in to the eligible employee's 401 (k) account as soon as administratively feasible. Barring any unforeseen circumstances, the Employer will do so within the first quarter of the following year. The employer will contribute 50% of Participant deferrals as a Matching Contribution, up to the annual maximum Matching Contribution shown in the following schedule:

| Participant Years of Service | Annual Maximum Matching Contribution |
|---|---|
| Less than 1 | No Matching Contribution |
| 1 to 5 | 50% of the first 3% of Annual Earnings |
| 6 to 10 | 50% of the first 6% of Annual Earnings |
| Over 10 | 50% of the first 10% of Annual Earnings |

## ARTICLE 25

## WAIVER

The parties acknowledge that during the negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining and that the understandings and agreements reached by the parties after the exercise of that right and opportunity are set forth in this Agreement. Therefore, the Employer and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated to bargain collectively with respect to any subject or matter not specifically referred to or covered in this Agreement even though such subjects or matters may not have been within the knowledge or contemplation of either or both of the parties at the time they negotiated or signed this Agreement.

## ARTICLE 26

## SEPARABILITY

Should any provision of this Agreement at any time during its life be found in conflict with Federal or State Law or as such laws may be amended, then such provision shall continue in effect only to the fullest extent permissible under the applicable law with the further understanding that if at any time thereafter, such provision is no longer in conflict with the law, then such provision of this Agreement as originally embodied therein shall be restored in full force and effect as if it had never been in controversy or violation. It is further understood and agreed that the provisions of this Agreement are

deemed to be separable to the extent that if and when a court or government agency of competent jurisdiction adjudges any provision of this Agreement to be in conflict with any law, rules or regulations issued thereunder, such decision shall not affect the validity of the remaining provisions of this Agreement, and such remaining provisions shall continue in full force and effect.

## ARTICLE 27

## DURATION

This Agreement shall be in effect from January 28, 2006 through and including January 27, 2009, and then shall automatically renew itself from year to year thereafter only unless the Employer or the Union gives written notice to the other party no less than sixty (60) but no more than ninety (90) days prior to January 27, 2009 of any subsequent year thereafter of its desire to terminate this Agreement.

However, it is understood that the foregoing provisions of this Article are subject to any subsequent determination made by the N.L.R.B. relative to the representation status of the Dresden site.

IN WITNESS WHEREOF, the parties hereto have hereunto caused their names to be subscribed and signed by their duly authorized officers as of the 28th day of January, 2006.

| THE WACKENHUT CORPORATION | SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 1 |
|---|---|
| BY: | BY: |
| TITLE: Dan Murphy, Director Labor Relations | TITLE: Thomas Balanoff, President |
| BY: | BY: |
| TITLE: Jerry Armstrong, Director Nuclear Operations | TITLE: Mona Ballenger, Security Dir. |
| BY: | BY: |
| TITLE: Paula O'Brien, Project Manager | TITLE: Edward Bowen, Union Rep. |
| BY: | BY: |
| TITLE: Project Manager | TITLE: |

# SCHEDULE A – WAGES

# DRESDEN STATION WAGE RATES

## SCHEDULE A

| Armed Security Officers | Current | 01/28/2006 | 01/28/2007 | 01/28/2008 |
|---|---|---|---|---|
| 0-6 Months | $13.52 | $13.86 | $14.34 | $14.84 |
| 6 Months | $14.06 | $14.41 | $14.92 | $15.44 |
| 1 Year | $14.60 | $14.97 | $15.49 | $16.03 |
| 2 Years | $15.14 | $15.75 | $16.30 | $16.87 |
| 3 Years | $15.68 | $16.39 | $16.96 | $17.55 |
| 4 Years | $16.66 | $17.41 | $18.02 | $18.65 |

| Unarmed Security Officers | Current | 01/28/2006 | 01/28/2007 | 01/28/2008 |
|---|---|---|---|---|
| All | $13.52 | $13.86 | $14.34 | $14.84 |

## Appendix A

## Shared Resource Agreement

In the spirit of cooperation between Wackenhut and the Labor Unions representing the security officers at the Exelon Nuclear Generating Facilities of Braidwood, Byron, Clinton, Dresden, LaSalle and Quad Cities it is agreed to, that during plant outages, TWC Security Officers from within the Exelon system can be used to supplement the TWC Security Force at the plant having the outage, under the following guidelines:

1.  Personnel will be paid at their current pay rate under the bargaining unit that they are members of and retain all rights afforded to them under their local collective bargaining agreement.

2.  Wackenhut will request volunteers for outage supplement duty and will fill positions from those who have volunteered by seniority from the most senior to the least senior.

3.  In addition to their standard hourly wage, officers on outage supplemental duty will receive a daily per diem of $32.00 and base mileage at Client Corporate rate. Mileage will be based on home plant to outage plant driving distance. Should lodging be necessary (determined by Exelon and Wackenhut), it will be provided at no cost to the officer.

4.  Normal length of service on supplemental duty will be approximately 30 to 45 days. No employee will be forced to participate in this agreement.

5.  When soliciting volunteers, Wackenhut will make it clear which site the officers are volunteering for. It is understood that volunteers will not be solicited for the purpose of replacing other security officers during a labor dispute.

6.  Shared Resource work will be distributed equally between the Security Officers at the effected station, and the Security Officers on the Shared Resource crew. The Security Officers at the effected station shall have unscheduled overtime preference.

# EXHIBIT

# B

# GRIEVANCE REPORT

**Service Employees International
Union Local 1 SEIU**
111 East Wacker Drive, Suite 2500
Chicago, IL 60601
Ph: (312) 240-1600 Fax: (312) 233-8845

| Date |
| --- |
| 01/24/07 |

**Name of Employer**
Wackenhut

**Grievance Number**

| **Union Representative** | **Name of Supervisor** |
| --- | --- |
| HALGREN, KEVIN | DeGrush, Darin |
| **Employee Name** | **Seniority Date** |
| SHULTZ, MICHAEL | 07/23/04 |
| **Home Address** | **Home Telephone** |
| 2824 Ashland circle apt.12 | 815-263-7828 |
| **City, State, Zip** | **Rate of Pay** |
| morris,il      60450 | 15.75 hr. until 1/28/07 then 16.30hr. |
| **Department** | **Job Title** |
| Security | Security Officer |

**Statement of Grievance**

On 1/10/07 officer Michael shultz was issued disciple for an infraction of Two policy 108.on 1/11/07 mike was contacted by Teresa Hakey and a meeting was scheduled for 1/12/07,at this meeting mike was suspended pending investigation of the same incident. the union feels that this suspension is unjust. Therfore this grievance is being forwarded to you under article 6 section 7 and is in violation of the Dresden CBA under article 2 article 22 sec. 8

**Settlement Desired**   **To be made whole in all terms of the contract up to and including S/O**

to be paid all pay at the appropriate rate and all suspension documentation be removed from his file

_Michael Shultz_
*Employee's Signature*

**Company Answer**

)PV

## Complete TWO copies of this form.

Received 1/24/07 0920
m - 4 mont

# EXHIBIT

# C

# GRIEVANCE REPORT

Service Employees International
Union Local 1
SEIU, AFL-CIO, CLC
111 East Wacker Drive, Suite 2500
Chicago, IL 60601
Ph: (312) 240-1600 Fax: (312) 233-8845

Date
2-16-07

**Name of Employer**
Wackenhut Security

**Grievance Number**

**Union Representative**
Kevin Halgren

**Employee Name**
Mike Shultz

**Home Address**
2324 Ashland Circle Apt 12

**City, State, Zip**
Morris, IL. 60450

**Department**
Dresden

**Name of Supervisor**
Art Austin / Darin DeGrush

**Seniority Date**
9-23-04

**Home Telephone**
815-263-7828

**Rate of Pay**
16 30/hr.

**Job Title**
Security Officer

**STATEMENT OF GRIEVANCE:** S/O Shultz states that he was unjustly
terminated. This is in violation of the Union Contract including Article
2, Article 22 section 8 and Policy 108.

**SETTLEMENT DESIRED:**    To be made whole in all terms of the contract up to and including S/O
Shultz being reinstated without the loss of seniority, wages and
benefits.

*Michael Shultz*
**Employee's Signature**

**COMPANY'S ANSWER:**

**Complete TWO copies of this form.**

# EXHIBIT

# D

## IN THE MATTER OF THE ARBITRATION BETWEEN

**THE WACKENHUT CORPORATION,**
**(Employer)**

**-and-**

**SERVICE EMPLOYEES**
**INTERNATIONAL UNION, SEIUE,**
**AFL-CIO, CLC, LOCAL 1,**
**(Union).**

FMCS No. 070403-55352-A
Termination of Mike Shultz

BEFORE:   ANN S. KENIS, ARBITRATOR
Arb. No. 07/026

## OPINION AND AWARD

<u>APPEARANCES</u>:

<u>On Behalf of the Employer</u>:

| | |
|---|---|
| Michael D. Carrouth | Attorney |
| Paula O'Brien | Project Manager |
| Crystal Thomas | Sergeant |
| David Grimsted | Sergeant |
| Darin Degrush | Lieutenant |

<u>On Behalf of the Union</u>:

| | |
|---|---|
| Edward Bowen | Lead Union Representative |
| Mike Shultz | Grievant |
| Kevin Halgren | Chief Union Steward |
| Alexia Kulwiec | Chief Counsel |

## I. INTRODUCTION

The hearing in this case was held on September 10, 2007 at the Holiday Inn in

Morris, Illinois before the undersigned Arbitrator who was duly appointed by the parties

to render a final and binding decision in this matter. At the hearing, the parties were

afforded full opportunity to present such evidence and argument as desired, including an

examination and cross-examination of all witnesses. No formal transcript of the hearing

was made. Both parties filed post-hearing briefs which were received on October 11,

2007, whereupon the hearing was declared closed.

## II.    STATEMENT OF THE ISSUES

The parties did not stipulate or otherwise agree upon the issue in this case.
Accordingly, the Arbitrator frames the issue in this matter as follows:

Was there just cause to terminate the Grievant, Mike Shultz?

## III.    PERTINENT CONTRACTUAL PROVISIONS

### ARTICLE 2 – MANAGEMENT RIGHTS

This Agreement shall not be construed to infringe or impair any of the normal
management rights of the Employer, which are not inconsistent with the
provisions of this Agreement. Included among management rights is the right to
hire new employees and direct the working forces; the right to discipline, suspend,
or discharge employees for just cause; the right to assign shifts; the right to
require employees to observe Employer policies, rules and regulations not
inconsistent with this Agreement...

### ARTICLE  6 – GRIEVANCE AND ARBITRATION PROCEDURE

*        *        *

**Step 4**...
**Section 3.**  The award of such arbitrator shall be in writing and shall be final and
binding upon the Employer, the Union, and the Security Officer involved. The
arbitrator may consider and decide only the particular grievance presented in the
written stipulation of the Employer and the Union, and the arbitrator's decision
shall be based solely upon an interpretation of the provisions of this Agreement.
The arbitrator shall not have the right to amend, take away, modify, add to,
change, or disregard any of the provisions of this Agreement. In the event that an

2

arbitrator shall determine that a Security Officer has violated an Employer rule, regulation or policy for which said Security Officer was charged, the arbitrator shall not have the right to reduce, modify, or in any way alter the penalty assessed by the Employer. The parties to the case shall share equally the expense of the arbitrator, including the hearing room incurred with the arbitration...

## IV.    RELEVANT POLICIES AND PROCEDURES

## A. SEXUAL HARASSMENT/WORKPLACE HARASSMENT POLICY

### Scope and Purpose

To establish a Corporate policy on sexual and workplace harassment in the workplace and to develop a procedure to follow in the event an employee feels he/she is a victim of harassment.

### Policy – Sexual Harassment

Sexual harassment, whether it occurs between a supervisor and a subordinate or between co-workers, cannot and will not be tolerated by the Company. Sexual harassment is a violation of Title VII of the Civil Rights Act of 1964 and it is against our policy for any employee, male or female, to sexually harass other employees by:

1) Making unwelcome sexual advances, requests for sexual favor or other verbal or physical conduct of a sexual nature a condition of an employee's employment, or

2) Making submission to or rejection of such conduct the basis for employment decisions affecting the employee; or

3) Creating an intimidating, hostile or offensive working environment by such conduct.

Sexual harassment may take different forms. Examples of several types of forms are:

Verbal:         Sexual innuendoes, suggestive comments, jokes of a sexual nature, sexual propositions or sexual threats.

Non-Verbal:    Sexually suggestive objects or pictures, suggestive or insulting sounds, ` leering, whistling or obscene gestures.

Physical:       Unwanted physical contact, including touching, pinching, brushing the body, coerced sexual intercourse or assault.

This list is not necessarily exhaustive of what could be construed as sexual harassment.

**Workplace Harassment**

Consistent with the Company's policy on sexual harassment, it is also strictly against policy for employees to harass other employees on the basis of race, color, religion, gender, national origin, age, disability or any other characteristic protected by law.

Harassment under this policy is verbal, non-verbal or physical conduct that denigrates or shows hostility or aversion toward another individual because of his/her race, color, religion, gender, material status, national origin, age disability, or any other characteristic protected by law or that of his/her relatives, friends or associates, and that:

1) Has the purpose or effect of creating an intimidating, hostile, offensive work environment; or

2) Has the purpose or effect of unreasonably interfering with an individual's work performance; or

3) Otherwise adversely affects an individual's employment.

Harassing conduct includes but is not necessarily limited to, epithets, slurs, or negative stereotyping; threatening, intimidating or hostile acts; and written or graphic material that denigrates or shows hostility or aversion toward an individual or group that is placed on walls or elsewhere in the employer's premises or circulated in the workplace.

## B. PROGRESSIVE DISCIPLINE POLICY

              *       *       *

**4.0 Policy**

**4.1 ...**Disciplinary action will be administered in a constructive manner that provides the employee with adequate notice and time for corrective action. Employees will be disciplined according to the seriousness of the infraction...

4.7.1 Security Shift Supervisors may issue suspensions of up to two (2) workdays.

4.8.1 The WNS Project Manager/DA will make the recommendation to terminate employment to the responsible Director/DA..

4.13 There are three levels of offenses (Levels I, II and III). These are only guidelines for use by management and supervisory personnel...

**LEVEL 1**

- Confirmed harassment of any form.

**LEVEL III**

- Use of abusive or offensive language in the presence of fellow officers or other personnel.

## V.    FACTUAL BACKGROUND

The Employer, Wackenhut Corporation, provides security services on a contract basis to a variety of organizations, including utility companies that operate nuclear power plants. Wackenhut has a contract to provide security services at the Dresden Nuclear Generating Station located in Morris, Illinois. The Union represents the security officers employed by Wackenhut at Dresden.

The Grievant, Mike Shultz, began his employment for Wackenhut on July 23, 2004. He worked as a security officer on the Delta team from 5:45 p.m. to 6:30 a.m. As a security officer, Grievant's duties included the prevention of radiological sabotage. Grievant signed an acknowledgement on March 10, 2006, confirming that he received and reviewed the sexual harassment/workplace harassment policy cited above.

The events which led to this grievance took place during the early morning hours of January 10, 2007. At approximately 1:50 a.m., Officer Danel Berg reported to Tower 9 to relieve the Grievant, who was standing watch at the Tower. Fellow officer David Grimsted was also present. During this relief process, Officer Berg stated that she had been unable to complete certain duties before reporting to the Tower. She informed the Grievant that he needed to perform those duties.

Grievant's response is the subject of dispute in this case. Officer Berg's incident report, completed shortly after her conversation with the Grievant, states that Grievant responded by saying to her, "You fucking cunt, you couldn't do it yourself?" However, it is important to point out that Officer Berg was not present at the arbitration hearing. Her

account is derived solely from the incident report she submitted and from the testimony of other witnesses to whom she subsequently complained.

Grievant testified that he told Berg "we gotta bunt" as he was climbing down the stairs, leaving the tower. He stated that this is a sports reference that he uses frequently. In Grievant's incident report, he stated that he used the word "bunt" and he insisted at hearing that he did not direct profanity or any derogatory language toward Officer Berg.

Officer Grimsted testified on direct examination that he thought Grievant responded to Officer Berg by saying "Cunt, couldn't you have done it yourself?" He stated that Grievant appeared to be "pretty perturbed" by the fact that he would have to finish Officer Berg's work. On cross-examination, however, Officer Grimsted admitted that he wasn't sure what Grievant said. According to Officer Grimsted, Grievant might have said, "Couldn't you have done it yourself?" When shown his incident report, which stated that Grievant "said something that sounded like 'cunt couldn't you have do it' or something to that effect," Officer Grimsted testified that he was not sure if Grievant used either the word "cunt" or "bunt." He even went so far as to say that he might have stated in his incident report that Grievant used the word "cunt" because Officer Berg suggested it.

In any event, Officer Berg reported the incident to the acting supervisor, Lt. Darin Degrush. According to Lt. Degrush, Officer Berg indicated that Grievant had called her a "fucking cunt." Upon receiving Officer Berg's complaint, Lt. Degrush stated that he would immediately investigate the matter.

Lt. Degrush first asked the Grievant about Officer Berg's allegation. Grievant responded that he had given up using profanity and that he substituted sports terms

instead, such as the word "bunt." Lt. Degrush asked the Grievant to prepare an incident report regarding the events that evening. Grievant did so. He explained in his incident report that he used the word "bunt" in the conversation with Officer Berg. Grievant testified at hearing that employees at the facility commonly use profanity without any disciplinary consequences.[1]

After talking to the Grievant, Lt. Degrush interviewed Officer Berg and Officer Grimsted. Officer Berg again told Lt. Degrush that Grievant had called her a "fucking cunt" when she had asked him to help with certain assignments. However, Officer Grimsted could not confirm Officer Berg's statement, Lt. Degrush testified. Officer Grimsted told Lt. Degrush that he was unclear about what had happened and shrugged when Lt. Degrush pressed him to try to recall the incident. Lt. Degrush asked both officers to prepare incident reports, and they complied.

Despite the conflicting accounts and Officer Grimsted's hazy recollection, Lt. Degrush concluded after reviewing all the information obtained from his investigation that Grievant's version "didn't cut it." Towards the end of the shift, he met with the Grievant and Union Steward Kevin Halgren. Grievant was issued an oral warning. In doing this, Lt. Degrush determined that Grievant had committed a LEVEL III offense by the "use of abusive or offensive language in the presence of fellow officers or other personnel" under the Progressive Disciplinary Policy. Under the Policy, Lt. Degrush had the authority to issue that level of discipline. He told Officer Berg that the matter had been taken care of and that he "put a serious item into someone's permanent file."

---

[1] Union Steward Halgren agreed. In fact, he stated that he overheard Officer Berg call a fellow officer a "fucking prick" when he refused to trade posts with her. The comment was not reported, Halgren testified, because it was considered petty "shop talk."

As Officer Berg was leaving the facility at the end of the shift, she approached Sgt. Crystal Thomas and told her what happened. Officer Berg complained that she was still concerned about the incident and was worried that she would be retaliated against for making a report regarding the Grievant.[2] Based on the concerns raised by Officer Berg, Sgt. Thomas indicated that the matter should be reported to higher level management.

On Friday, January 12, 2007, Grievant and Union Steward Halgren met with management and were informed that there would be further investigation. Halgren indicated that the Grievant had already been disciplined for the incident. Grievant was suspended pending investigation at the conclusion of the meeting.

The matter was ultimately turned over for further review by Paula O'Brien, Project Manager for the Dresden facility.  O'Brien again interviewed Officers Berg, Grimsted and the Grievant. She also asked security officers at the Dresden site what the terms "punt" and "bunt" meant to them. Everyone who was asked this question reported that those terms were sports terms and that they did not have any work-related meaning. Project Manager O'Brien determined that Grievant had in fact called Officer Berg a "fucking cunt" and that his explanation of the events that had occurred was less than honest.

After review of the matter, O'Brien concluded that the incident had not been properly evaluated or handled. According to O'Brien, Grievant's comment was gender specific; it was directed specifically to Officer Berg; and it created an offensive work environment. O'Brien was of the view that Lt. Degrush had improperly characterized Grievant's misconduct as a LEVEL III violation for abusive or offensive language in the

---

[2] Sgt. Thomas's statement indicates that Officer Berg's concern about retaliation was the result of comments made by Lt. Degrush, not by the Grievant.

presence of fellow officers or other personnel. In O'Brien's opinion, Grievant's actions

should have been considered a LEVEL I offense for engaging in "confirmed harassment

of any form."

Grievant was discharged on February 16, 2007 and the instant grievance was filed

on that same date. When the parties were unable to resolve the matter during the steps of

the grievance procedure, it was appealed to arbitration, where it now comes before this

Arbitrator for final and binding resolution.

## VI.    CONTENTIONS OF THE PARTIES

### A.    THE EMPLOYER

The Employer contends that there was just cause for discharge in the instant case.

Management submits that it established by a preponderance of the evidence that the

Grievant violated the Sexual Harassment/Workplace Harassment Policy and the

Progressive Discipline Policy, which establishes that confirmed harassment of any form

provides justification for immediate, summary discharge. The Employer recognizes that

the complainant, Officer Berg, was not present at hearing to testify. Despite her absence,

however, Management argues that there is sufficient evidence in the record to confirm

that the Grievant directed an offensive and harassing statement at Officer Berg.

Management points to the fact that Officer Berg indicated in her incident report, as well

as her verbal statements to Lt. Degrush and Project Manager O'Brien, that Grievant

called her a "fucking cunt." In addition, Officer Grimsted's testimony confirmed the

complaint made by Officer Berg. He confirmed that Grievant was agitated and upset

when Officer Berg told him that he needed to help complete some routine tasks at the

time he was relieved. Moreover, he confirmed that he heard what sounded like, "Cunt,

couldn't you have done it?" In addition, Officer Grimsted confirmed that, on the night in question, at the time he filled out his incident report, and when he was interviewed by O'Brien, he consistently stated that he thought he heard Grievant say something like, "Cunt, couldn't you do it yourself?" Finally, Officer Grimsted testified that the terms "punt" or "bunt" are not routine work terms used at the Dresden site.

While the Grievant denied directing an offensive statement at Officer Berg, he admitted that he was upset with her, and the remaining evidence casts considerable doubt on his assertion that he responded by using the word "bunt." Moreover, Grievant is presumed to have an incentive for shading the truth because his job is on the line. Any credibility contest must therefore be resolved against the Grievant and in favor of the Employer's witnesses.

To the Employer, it is clear that Grievant violated the policies cited in this matter. Grievant verbally denigrated Officer Berg in a manner that was gender-specific. His comment had both the purpose and effect of unreasonably interfering with Officer Berg's work performance and adversely affected her employment. Grievant had notice that engaging in this type of workplace harassment could result in termination. Moreover, there is no dispute that the Employer conducted a fair and objective investigation prior to disciplining the Grievant. Based on all these circumstances, the Employer properly relied on its progressive discipline policy which specifically provides that "confirmed harassment of any form" is grounds for immediate discharge.

The Employer further argues that the Union's asserted defenses are unpersuasive. The Union contends that the Employer can only terminate an employee for sexual harassment if there exists a pattern of harassing behavior. However, that assertion is

contrary to the policy itself which specifically prohibits single acts of misconduct that "have the purpose or effect of creating an intimidating, hostile and offensive work environment."

Moreover, the Union's double jeopardy argument is misplaced. The Union has waived its right to assert the double jeopardy defense because the only issue the Arbitrator can evaluate is whether the Grievant has violated the particular rule for which he was discharged. The Arbitrator does not have the right under the contract to reduce, modify or in any way alter the penalty assessed by the Employer. Thus, if the evidence establishes the violation, the Company's selected penalty cannot be changed. That is what the parties have agreed upon and the Arbitrator's authority extends only as far the contract itself allows.

Finally, even if the double jeopardy argument is considered relevant, it would not justify setting aside the decision to discharge the Grievant. The Employer submits that when Lt. Degrush issued the Grievant a verbal warning, he based his decision on a completely inaccurate and inappropriate evaluation of the Employer's progressive discipline policy. He disregarded the fact that Grievant's offensive statements were directed specifically to Officer Berg and were intended to degrade her on the basis of her gender. Equally important, Officer Berg continued to have concerns regarding her employment and how the issue she raised had been handled. This gave the Employer the right to review the entire situation to determine whether it had been properly handled. Arbitral precedent recognizes that double jeopardy does not apply when an employer is able to show that new and additional facts warrant reconsideration of a prior disciplinary decision or when the employee's misconduct establishes valid grounds for discipline for

more than one work rule violation. Both exceptions to the rule of double jeopardy apply here.

For all these reasons, the Employer maintains that it has shown that Grievant committed a violation of the sexual harassment/workplace harassment policy, and therefore the grievance must be denied.

**B.    THE UNION**

The Union asserts that the Employer failed to meet its burden of proving that just cause existed to discharge the Grievant. First, the Union argues that the evidence regarding the incident on January 10, 2007 was simply not sufficient to establish that Grievant used profanity or directed a sexually vulgar and offensive term toward Officer Berg. The Union reminds the Arbitrator that Officer Berg did not testify at hearing; Officer Grimsted equivocated in his testimony; and the Grievant denied using the offensive terminology.  The Employer cannot overcome its burden of proof based on this stated of the record, the Union submits.

Second, the Union contends that sexual harassment has not been proven even if the Arbitrator were to credit Officer Berg's hearsay allegations. In order to establish the existence of a hostile work environment, there needs to be a pattern of behavior or a single egregious incident. Neither has been shown in this case.

Finally, the Union argues that the principle of double jeopardy applies to the facts at hand. Grievant was issued a verbal warning after his immediate supervisor properly investigated the incident. Grievant's supervisor had the authority to issue that level of discipline and he did so. Once a determination was made by supervision to warn the Grievant, the penalty could not thereafter be increased without running afoul of double

12

jeopardy. Yet that is precisely what happened here when Project Manager O'Brien

learned of the incident and decided that the penalty should be increased to the level of

discharge.

When Lt. Degrush issued the Grievant a warning, the incident was closed. The

Employer should not be permitted to say that they decided the penalty was not severe

enough and that termination could thereafter be imposed. Although the Employer argues

that the Arbitrator does not have the authority to modify the penalty assessed, the Union

responds by saying that consideration of the double jeopardy issue goes to the very heart

of the just cause determination the Arbitrator has been asked to make. The Union is not

asking the Arbitrator to reduce the penalty; it is requesting that the disciplinary warning

be enforced. Accordingly, the grievance should be sustained in its entirety.

## VII.    FINDINGS AND DISCUSSION

In a disciplinary case, arbitral authority has long held that the burden rests upon

the employer to establish just cause for discharge. As the Elkouris explain in *How*

*Arbitration Works* (6th Ed. 2003), p. 948:

> There are two 'proof' issues in the arbitration of discipline and discharge cases.
> The first involves proof of wrongdoing; the second, assuming that guilt of
> wrongdoing is established and the arbitrator is empowered to modify penalties,
> concerns the question of whether the punishment assessed by management should
> be upheld or modified...

We will discuss in due course whether or not this two-pronged analysis is

applicable in the instant matter. First, however, we turn to the threshold issue. Has the

Employer established that Grievant in fact committed the misconduct of which he stands

accused?  After careful consideration of all the evidence and testimony presented at

hearing, as well as the parties' thorough post-hearing briefs and the precedent awards cited therein, I find that the Employer has not met its burden of proof.

Three security officers were present in the tower at the time of the alleged incident on January 10, 2007. It is undisputed that there was a verbal exchange between Officer Danel Berg and the Grievant. There is also no dispute that Officer Grimsted was present at the time. The Employer contends that Grievant referred to Officer Berg as a "fucking cunt." That factual predicate is the lynchpin of the Employer's case, but it is problematic from several standpoints.

First, the Employer was forced to rely on hearsay evidence when Officer Berg, the recipient of Grievant's alleged statement and the complainant in this matter, did not testify at hearing. Her written incident report was admitted into the record, as was testimony from other witnesses concerning Officer Berg's statements to them. This evidence was offered by the Employer to establish the truth of the matter asserted in the absence of Officer Berg's presence at the arbitration hearing.

It is well-established that hearsay evidence is not admissible in a court of law to prove a fact that will determine the outcome in a case. Many reasons for the exclusion of hearsay evidence are based on common sense arguments developed over hundreds of years of common law. Hill and Sinicropi, in *Evidence in Arbitration* (2d Ed. 1987), p. 135, explain the evidentiary problem as follows:

> ...the inherent problems with the evidence offered by absent witnesses concern its reliability. The...statements were not made under oath before a trier of fact, nor are they available for cross-examination to test for the presence of the problems of ...perception, memory, veracity, and communication....Reliance on the...testimony would deprive the defendant-grievant of the chance to test whether the co-workers were lying, misremembering, or just reporting ineptly. This lack of opportunity for cross-examination is the primary justification for the exclusion of hearsay.

That is not to say that hearsay evidence is inadmissible in arbitration as in a court of law. On the contrary, the general rule in arbitration is that hearsay may be admitted in some circumstances even though the rule of evidence in a court would exclude it. This is because it is recognized that arbitration proceedings are informal, and advocates are not always familiar with the legal technicalities expected of lawyers in a courtroom. Arbitrators are presumed to have the expertise and experience to sift through and evaluate the evidence and assign it the proper probative weight. In addition, policy reasons favor the admission of hearsay. The process is supposed to be an "escape valve" for tensions in the workplace and it is believed that there is value in permitting both parties to "get things off their chest," even though the evidence presented might be deemed inadmissible in a formal courtroom setting. See, <u>Bamberger's</u>, 59 LA 879 (Glushien, 1972); <u>Ambassador Convalescent Center</u>, 83 LA 45 (Lipson, 1984).

Nevertheless, one must always bear in mind the inherent weaknesses and due process problems presented by the submission of hearsay evidence, particularly in the context of a discipline case where the employer has the burden of proving just cause. Arbitrator Teple expressed the thinking of many arbitrators who refuse to credit a statement by an absent witness:

> A written statement cannot be relied upon to establish the entire truth of the matter, and in a hearing cannot be given the same weight as oral testimony in the course of which the Arbitrator may observe the witness and which is subject to cross examination during which any uncertainties are subject to further inquiry. <u>Akron General Medical Center</u>, 77-2 ARB Par. 8336 at 4445 (1977).

Here, the core of the Employer's case hinges on the hearsay accusation of Officer Berg who, for whatever reason, did not appear at the hearing to face the Grievant. Her hearsay statements cannot be relied upon under these circumstances since, as it

developed, the matters contained in her statement were too important to deprive the Union of its right to cross-examination and thereby perhaps to impeach her serious accusations against the Grievant.

The Employer attempted to bolster its case by presenting Officer Grimsted at the hearing, but his testimony had its own problems. Officer Grimsted waffled back and forth about what he actually heard the Grievant say in response to Officer Berg. The only consistent theme to Officer Grimsted's testimony was its inconsistency. The report he provided to Lt. Degrush shortly after the incident stated that Grievant said "something that sounded like 'cunt couldn't you have done it' or something to that effect," yet when Lt. Degrush questioned him, Officer Grimsted was unable to confirm the accuracy of the statement. Similarly, at the hearing, Officer Grimsted first testified that he thought Grievant said, "cunt, couldn't you have done it yourself?" but on cross-examination he conceded that he was unsure and eventually he admitted that it might have been Officer Berg's "power of suggestion" that led him to even think that Grievant used the word "cunt." According to Officer Grimsted, Grievant could just as easily have said, "couldn't you have done it yourself?" He could not commit himself either way.

It is clear to the Arbitrator that Officer Grimsted's testimony cannot be given much probative weight. His version of the Grievant's response to Officer Berg was simply not consistent at any point. The Arbitrator cannot make a choice between the differing versions presented by this witness. Instead, his inconsistency causes this Arbitrator to find his testimony unpersuasive.

The only other witness to the incident was the Grievant himself, and while the Employer argues that his account strains credulity because it is so unlikely that he would

have told Officer Berg to "bunt," the fact remains that it was the Employer's burden to prove that the misconduct occurred as a prima facie matter. It was not the Grievant's burden to establish his innocence.

All told, the evidence was not sufficient to meet the Employer's evidentiary burden. Regardless of the standard of proof required – whether it is a preponderance of the evidence standard or an even higher standard – the Employer failed to convince me that the alleged wrongdoing actually occurred. Hearsay and a waffling witness are not enough to persuade this trier of fact that the first prong of the Employer's just cause obligation has been met.

The parties have raised various arguments about the propriety of the penalty imposed. However, as the Employer correctly points out, the second prong of a just cause analysis addressing the reasonableness of the discipline comes into play only if the guilt of wrongdoing is first established and the arbitrator is empowered to modify penalties. Neither of those preconditions is present in the instant case. The parties' collective bargaining agreement limits the scope of the Arbitrator's authority to only determining whether the security officer violated the rule for which he was charged. In exercising that authority in the instant case, it is my determination that the rule violation has not been established. That determination is dispositive of the case and requires that the grievance be sustained in its entirety.

## VIII.  AWARD

For the reasons set forth above and incorporated herein:

A.  The Employer failed to meet its burden of proving the misconduct alleged. On that basis, there was no just cause to discharge the Grievant.

B.  The grievance is sustained. The Grievant shall be reinstated without loss of seniority, benefits or wages, less any interim earnings or benefits.


_____

ANN S. KENIS, Arbitrator


Dated this 8th day of November, 2007.